IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JPMCC 2002-CIBC4 HIGHLAND RETAIL, LLC | § § | CASE NO. 10-11331 |
| | § | (CHAPTER 11) |
| DEBTOR | § | |

## AFFIDAVIT OF MATILDE G. BORCHERS

I, Matilde G. Borchers being duly sworn, declare the following under penalty of perjury:

I am Vice President of LNR Texas Partners, Inc. ("LNR Texas"), sole manager of JPMCC 2002-CIBC4 Highland Retail, LLC (the "Debtor"). I am also an asset manager for LNR Partners, Inc. I am familiar with the Debtor's operations, structure and financial affairs and have personal knowledge of the facts set forth herein.

## II. BACKGROUND

A. **The Ground Lease and the Subsequent Financing.**

1. Prior to the Petition Date, American General Life and Accident Insurance Company ("AIG"), by and through its predecessor-in interest, and Highland Mall Limited Partnership ("HMLP")[1] were parties to that certain Amended and Restated Lease Agreement dated November 20, 1979 and amended June 28, 2001 (the "Ground Lease"). The Ground Lease provided for a 99-year ground lease by HMLP of a parcel of land located in Austin, Texas to construct and operate Highland Mall ("Highland Mall"). As lessee under the Ground Lease, HMLP entered into a number of subleases with various tenants and anchor tenants who sublet space in Highland Mall to operate their businesses. Among these anchor tenants are Dillard

---

[1] HMLP is a joint venture between wholly owned subsidiaries of General Growth Properties, Inc. and Simon Property Group.

Texas, LLC and The Higbee Company (together, "Dillard"), whose predecessors entered into an original long term lease of space at Highland Mall on March 18, 1971 (the "Sublease").

2.  As part of the operation of Highland Mall, HMLP obtained a loan from Morgan Guaranty Trust Company of New York in the amount of $71,000,000 (the "Loan") evidenced by a promissory note, dated June 28, 2001 (the "Promissory Note"). The Loan is a nonrecourse obligation, secured by that certain Leasehold Deed of Trust and Security Agreement, dated June 28, 2001 and covering HMLP's leasehold estate under the Ground Lease. Through a series of assignments, Wells Fargo Bank, N.A., as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates Series 2002-CIBC4 (the "Lender") is now the owner and holder of the mortgage on the Ground Lease. LNR Partners, Inc. ("LNR") is the special servicer for the Loan.

**B.   The Debtor's Relationship to Lender.**

3.  The Debtor, a Delaware limited liability company, was formed as a special purpose entity on December 16, 2009 for the express purpose of holding the assets that previously secured the Loan. The Lender owns 100% of the membership interests in the Debtor, and LNR Texas is the non-member manager of the Debtor.

4.  The obligations evidenced by the Promissory Note represent non-recourse debt, and were not assumed by the Debtor. Rather, upon assignment of the collateral securing the Loan to the Lender's assignee (the Debtor), the indebtedness was effectively extinguished, and the Lender does not intend to assert a claim in the bankruptcy case. Accordingly, upon information and belief, the Lender is not a creditor of the Debtor.

**C.   The Debtor Assumes the Ground Lease.**

5.  On or about July 15, 2009, AIG notified HMLP that HMLP was in default under the Ground Lease and that the Ground Lease could be terminated as a result if these defaults

were not cured. Specifically, AIG alleged that HMLP had failed to: (1) invest "improvement money" in order to maintain Highland Mall's status as a "first class" regional shopping mall; (2) repair roof leaks and related damage occurring at Highland Mall; and (3) comply with its obligations to certain sublesees, including Dillard. The July 15 default letter was preceded by a lawsuit filed by Dillard against HMLP in District Court seeking a declaration that HMLP was in default of its sublease with Dillard.

6. The Ground Lease provides the leasehold mortgagee (*i.e.*, the Lender) with the right to assume the Ground Lease from the lessee (*i.e.*, HMLP) upon any act of default by the lessee if notice is provided within 30 days of receiving notice of default from AIG. Among other remedies, Section 9.08 of the Ground Lease grants the Lender, as leasehold mortgagee, the "right...to notify Lessor in writing within thirty (30) days after receipt by leasehold mortgagee of such second notice that leasehold mortgagee or any designee or nominee of leasehold mortgagee elects to assume Lessee's rights and obligations under the [Ground] Lease...and to lease the Leased Property from the date of termination specified by Lessor in such second notice."

7. On or about August 19, 2009, AIG provided HMLP with a second notice (the "Second Notice") pursuant to Section 9.08 of the Ground Lease, in which AIG asserted that HMLP had failed to cure the alleged acts of default and that AIG was terminating the Ground Lease on August 31, 2009. Upon receipt of the Second Notice, the Lender had until August 31, 2009 to cure (or commence to cure) any defaults or until September 18, 2009 to notify AIG of its election to assume the Ground Lease.

8. On August 30, 2009, the Lender notified AIG that it was commencing efforts to cure any outstanding defaults under the Ground Lease. Thereafter, AIG and the Lender then

3

entered into a series of standstill agreements to give the parties additional time to attempt to negotiate a resolution to certain outstanding issues surrounding the operation of Highland Mall.

9. The standstill period was extended through a series of agreements to preserve the parties' respective rights under the Ground Lease until December 16, 2009, at which point the Lender notified AIG that, pursuant to Section 9.08 of the Ground Lease, the Debtor (as Lender's designee) would assume HMLP's rights and obligations as lessee under the Ground Lease. Thereafter, AIG and the Lender entered into a second series of standstill agreements through January 13, 2010. On February 12, 2010, the Lender notified AIG of its continuing effort to cure any outstanding defaults under the Ground Lease and requested certain information required for it to timely comply with its remaining obligations, if any, under Section 9.08 of the Ground Lease.

10. Since that time, AIG has not responded to the Lender's requests for certain information pertaining to Highland Mall and the Ground Lease necessary for the Debtor to effectuate the assumption of the lessee's obligations under the Ground Lease.

11. Owing to AIG's refusal to acknowledge the Lender's exercise of its right to have its designee assume the Ground Lease, however, on May 3, 2010, HMLP executed an Improvements Deed and Assignment and Assumption of Ground Lease in favor of the Debtor, whereby the Debtor assumed the rights and obligations of Lessee under the Ground Lease.

**D.     The Dillard Lawsuit.**

12. In 1971, E. M. Scarbrough & Sons, Inc. ("Scarbrough's") entered into a long-term lease for approximately 80,000 square feet of space in Highland Mall, becoming one of the mall's earliest anchor tenants. Dillard became one of Highland Mall's key retail anchor tenants in 1992, when it assumed Scarbrough's obligations under the 1971 lease.

13. On March 27, 2009, Dillard filed a *Complaint for Declaratory Judgment* (the "Dillard Lawsuit") against HMLP styled *Dillard Texas, LLC, et al. v. Highland Mall Ltd. P'ship*, Case No. 1:09-cv-00218-JRN, and pending in the United States District Court for the Western District of Texas. In the Dillard Lawsuit, Dillard seeks declarations that HMLP has breached its obligations under sublease obligations to Dillard "by failing to maintain and operate Highland Mall to the standard of North Star Shopping Center in San Antonio, Texas in March 1971."

14. Essentially, Dillard asserts that, by allegedly failing to operate Highland Mall as a "first-class" enclosed shopping mall, HMLP breached its obligations under the Sublease such that Dillard has no further obligation to HMLP thereunder. Dillard also claims that the spaces it occupies have suffered water damage, and seeks an additional declaration that Dillard has no obligation relating to the repair of any portion of the building or roof damaged by water intrusion. Notably, Dillard had just recently exercised its second option to *extend* the term of the original 1971 lease for another ten years from February 1, 2007 to January 31, 2017.

15. On May 5, 2010, the Debtor filed its *Motion to Intervene and Substitute Party and Request for Expedited Consideration* (the "Motion to Intervene") in the Dillard Lawsuit. Simultaneously with the commencement of this chapter 11 case, the Debtor (as intervenor and successor to HMLP's rights under the Ground Lease) then removed the Dillard Lawsuit to this Court pursuant to 28 U.S.C. § 1452.

E. **Highland Mall Today.**

16. In the late 1960's and early 1970's, Highland Mall (originally named Austin Mall) was constructed in Austin, Texas. From the time of its opening, Highland Mall boasted multiple retail anchor tenants combined with numerous "inline" tenants to offer consumers a first-class shopping experience in what became the first enclosed, air-conditioned shopping mall in the Austin metropolitan area.

17. Today, Highland Mall faces increasing competition from newer shopping malls, such as the newly completed mall in northwest Austin, The Domain. Upon information and belief, the demographics of Austin and the Austin-Round Rock-San Marcos metropolitan statistical area have altered profoundly over the last several decades. While Austin's explosive growth over the last 40 years is well-documented, much of that expansion has been away from Austin's original urban center.

18. Upon information and belief, these ongoing demographic pressures have inescapably altered the city's landscape and created new challenges (both economic and demographic) for the owner and operator of Highland Mall. In light of these significant challenges, and in an attempt to maximize the value of its assets for its remaining creditors and equity owners, the Debtor sought protection under chapter 11 of the Bankruptcy Code.

## II. THE FIRST DAY MOTIONS

### A. Notice of Designation as Complex Chapter 11 Case

19. Upon information and belief, there are more than fifty (50) parties in interest in this chapter 11 case, including statutory lien claimants, utility providers, AIG (as lessor under the Ground Lease) and more than ninety (90) sublessees and tenants of Highland Mall.

20. In addition, the Debtor is already party to one pending lawsuit (the Dillard Lawsuit) relating to the Debtor's ownership of its principal asset (the Ground Lease) and the value of that asset, and anticipates that at least one more lawsuit is forthcoming with respect to the Ground Lease.

### B. Motion for an Extension of Time to File Schedule of Assets and Liabilities, Schedule of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs

21. The Debtor requests that the Court extend the time for the Debtor to file its (i) schedules of assets and liabilities, (ii) schedule of executory contracts and unexpired leases,

and (iii) statement of financial affairs (collectively, the "Schedules") by an additional 30 days, without prejudice to the Debtor's ability to request additional time should it become necessary.

22. The Debtor submits that "cause" exists sufficient to extend its time to file the Schedules in view of the facts and circumstances of this case. Because the Debtor has only recently taken possession of Highland Mall and assumed the obligations of the lessee under the Ground Lease, the Debtor anticipates that it will be unable to complete the Schedules in the 14 days provided under § 521 and Bankruptcy Rule 1007. The Debtor is still in the process of familiarizing itself with Highland Mall's books and records and gathering the information necessary to complete the Schedules.

23. While the Debtor is working diligently and expeditiously to prepare the Schedules, the Debtor's resources are limited. In view of the competing demands upon the Debtor's employees and professionals to assist in efforts to stabilize business operations during the initial post-petition period, the Debtor will not be able to properly and accurately complete the Schedules within the required 14-day time period.

C. **Motion for an Order Authorizing the Debtor to (I) Continue Using Existing Cash Management Systems, (II) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Account and Business Forms**

24. Prior to the Petition Date, in the ordinary course of business, the Debtor implemented a streamlined cash management system (the "Cash Management System") to efficiently collect, transfer, and distribute funds generated by business operations. The Cash Management System facilitates cash monitoring, forecasting, and reporting.

25. The Cash Management System utilizes two bank accounts (the "Accounts"), which are maintained at Bank of America (the "Bank"): (i) a depository (lockbox) account, assigned Account No. 8666615453 (the "Deposit Account") and (ii) an operating (disbursement)

account, assigned Account No. 4426853811 (the "Disbursement Account"). The Deposit Account is used to collect funds generated by the Debtor's business operations. These funds primarily come from rental income related to the Debtor's operation of Highland Mall. As tenants pay monthly rent, such rent is deposited into the Deposit Account. Tenant Notice Letters have already been sent out directing tenants to pay current and future rent obligations to the Deposit Account.

26. Disbursements for operating costs and other expenses and are made via checks, wires, and ACH Transfers are paid from the Disbursement Account, which is funded as needed from the Deposit Account.

*Authority to Continue to Use the Cash Management System*

27. The Debtor's Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtor including, *inter alia*, the ability to: (i) control funds; (ii) ensure the availability of funds when necessary; and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtor's reorganization efforts. Therefore, the Debtor requests that the Bank be authorized to permit the Debtor to use the Cash Management System currently in place to manage the Debtor's cash in a manner consistent with the Debtor's prepetition practice, subject to such changes from time to time as necessary to address the basic purposes of the Cash Management System.

28. The Debtor will continue to maintain all receipts and disbursements and records of all transfers within the Cash Management System utilized post-petition, which will not be difficult since the Debtor only just recently commenced operations a few days prior to the

Petition Date. This will ensure that all transfers and transactions will be properly documented, and accurate balances will be maintained to the benefit of all parties in interest. The Debtor will maintain its books and records relating to the Cash Management System to the same extent such books and records were maintained prepetition. Based on the foregoing, the Debtor believes that maintenance of the existing Cash Management System is in the best interests of its estate and all parties in interest. Therefore, the Debtor seeks authority to maintain and use the Cash Management System during this chapter 11 case.

*Authority to Honor Certain Prepetition Obligations of the Debtor Related to the Cash Management System*

29. In connection with the use of the Cash Management System, the Debtor incurs periodic service charges and other fees to the Bank for the maintenance of the Cash Management System (the "Service Charges"). The Debtor hereby requests authority to pay any prepetition Service Charges that remain unpaid as of the Petition Date. Payment of the prepetition Service Charges is in the best interests of the Debtor, its estate, and all parties in interest as it will prevent any disruption to the Cash Management System. Because the Bank has setoff rights with respect to the Service Charges, payment of any prepetition Service Charges will not affect unsecured creditors and paying any prepetition Service Charges will merely be a matter of timing.

*Authority to Maintain the Accounts and Prepetition Business Forms*

30. The Accounts are an integral part of the Cash Management System. Rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") would require the closure of the Accounts on the Petition Date, the opening of new accounts, and the immediate printing of new checks with the full name of the debtor in possession as it appears on the voluntary petition as well as a "Debtor in Possession" and case number designation. The Debtor believes that its transition to chapter 11

will be smoother, less costly and more orderly, and disruption and harm to the Cash Management System will be minimized, if the Debtor is permitted to continue using the existing Accounts.

31. Unless otherwise authorized by this Court, the Bank shall not honor or pay any check issued on account of a prepetition claim. The Debtor requests that the Bank be authorized to accept and honor all representations from the Debtor as to which checks, drafts, wire transfers, ACH Transfers (collectively, the "Transfers"), or other debits should be honored or dishonored consistent with any order(s) of this Court, whether or not the Transfers are dated prior to, on, or subsequent to the Petition Date. The Bank shall not be liable to any party on account of following the Debtor's instructions or representations regarding which Transfers should be honored. The Bank also shall be permitted to accept and process chargebacks against the Accounts arising out of returned deposits into such accounts without regard to the date such return item was deposited. As the Debtor only recently commenced business operations, the number of checks issued on account of a prepetition claim should be minimal, and the Debtor should be able to easily identify all such checks. Therefore, there is little risk to the estate in allowing the Debtor to continue its existing Accounts.

32. By preserving business continuity and avoiding disruption and delay to the Debtor's disbursement obligations, including payroll that necessarily would result from closing the Accounts, all parties in interest, including employees, vendors, and customers, will be best-served. The confusion that otherwise could result, absent the relief requested herein, would ill-serve the Debtor's rehabilitative efforts. Accordingly, the Debtor respectfully requests authority to continue using the Accounts in the ordinary course of business.

33. In addition, to minimize expenses, the Debtor further requests authorization to continue to use its correspondence and business forms, including, but not limited to, purchase

orders, multi-copy checks, letterhead, envelopes, promotional materials, invoices, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to the Debtor's status as debtor in possession; provided, however, that the Debtor shall commence marking its full name exactly as it appears on the voluntary petition as well as the term "Debtor in Possession" and the chapter 11 case number on their existing check stock and wire transfer instructions instead of having new stock printed with such markings.

34. If the Debtor is not permitted to maintain and utilize the Accounts and its existing Business Forms, the resultant prejudice will include significant: (i) disruption to the Debtor's ordinary financial affairs and business operations; (ii) delay in the administration of the Debtor's estate; (iii) cost to the estate to set up new systems, print new business forms, and print new checks. Accordingly, authorization to maintain the Accounts and Business Forms is appropriate in this chapter 11 case.

*Compliance with § 345*

35. The Bank is approved by the U.S. Trustee as an authorized depository. Accordingly, the Debtor believes that any funds that are deposited in the Accounts are secure and, thus, the Debtor is in compliance with § 345.

**D.    Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment For Future Utility Services**

36. In the ordinary course of its business, the Debtor obtains water, electric and other utility services from various utility providers (the "Utility Providers"). A list of the known Utility Providers who rendered services to the Debtor as of the Petition Date (the "Utility Service List") is attached to the corresponding motion.

37. Uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Any interruption of utility services would negatively affect the Debtor's operations, customer relationships, revenues and profits, seriously jeopardizing the Debtor's reorganization efforts. Therefore, it is critical that utility services continue uninterrupted during this chapter 11 case.

38. The Debtor anticipates that the cash flow from operations and cash on hand will be sufficient to pay all post-petition obligations related to its utility service. In addition, upon information and belief, the Debtor is current on its payment obligations to all Utility providers. Nevertheless, to provide additional assurance of payment to the Utility Providers for future services, the Debtor proposes to deposit an amount equal to the cost of two weeks' utility service, calculated as a historical average over the past 12 months (the "Adequate Assurance Deposit"), into a newly-created, segregated account (the "Adequate Assurance Deposit Account") for Utility Providers.[2] The Debtor believes that the Adequate Assurance Deposit, coupled with the Debtor's demonstrated ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.

39. The Proposed Adequate Assurance more than adequately assures payment to the Utility Providers. The Debtor expects that its revenue from continued operations coupled with cash on hand will be sufficient to pay their operating costs, including utility costs, as they come due. These factors, which the Court may consider when determining the amount of any adequate

---

[2] The Debtor further requests that any Adequate Assurance Deposit which is deposited into the Adequate Assurance Deposit Account on behalf of any Utility Provider be returned to the Debtor or its designee at the conclusion of this case.

assurance payments, justify a finding that the Proposed Adequate Assurance is more than sufficient to assure the Utility Providers of future payment.

E.  **Application for an Order Authorizing the Employment of Jones Lang LaSalle, Inc. as Property Manager and Leasing Agent**

40. The Debtor seeks to retain Jones Jang LaSalle, Inc. ("Jones Lang") as property manager and leasing agent because of Jones Lang's extensive knowledge of commercial retail property management, including the management of regional shopping malls. The Debtor believes that Jones Lang is well qualified to effectively manage Highland Mall and that the employment of Jones Lang pursuant to § 327(a) would be in the best interest of the estate.

41. The services of Jones Lang are necessary to enable the Debtor to execute faithfully its duties as a debtor in possession. The Debtor is ill equipped to handle the massive undertaking involved in personally managing the day-to-day operations of Highland Mall. The retention of Jones Lang as property manager will ensure that Highland Mall's operations continue seamlessly while the Debtor focuses on its restructuring. Subject to further order of this Court, Jones Lang will be asked to render, among others, the following services to the Debtor:

(a) to supervise and direct the business associated or related to the daily operation of the Property thereof;

(b) to collect all payments due from tenants of Highland Mall;

(c) to ensure the maintenance, repair and general upkeep of the building, equipment and common areas of Highland Mall;

(d) to collect rents and charges from all tenants of the Property;

(e) to make contracts (subject to Bankruptcy Court approval, as warranted) for water, electricity, gas, fuel, telephone, pest extermination, elevator service, office cleaning, security, HVAC maintenance and other necessary services;

(f) to make recommendations to the Owner on the suitability of protests of real estate valuations;

(g) subject to the terms of the Management Agreement and (as applicable) the Bankruptcy Code, to employ all necessary employees to successfully manage the Property;

(h) to maintain accounts receivable records, accept rental payments, make deposits, invoice tenants on a monthly basis, and manage any evictions; and

(i) to perform such other property management services as may be required.

42. To the best of the Debtor's knowledge, and except as otherwise disclosed in the *Affidavit of Kristin Mueller in Support of Application for an Order Authorizing the Employment of Jones Lang LaSalle, Inc. as Property Manager and Leasing Agent* (the "Jones Lang Affidavit"), Jones Lang has not represented the Debtor, its creditors, or any other parties in interest, or their respective attorneys, in any matter relating to the Debtor or its estate.

43. To the best of the Debtor's knowledge, and except as otherwise disclosed in the Jones Lang Affidavit, Jones Lang does not hold or represent any interest adverse to the Debtor's estate, is a "disinterested person" as that phrase is defined in § 101(14), and such employment is necessary and in the best interests of the Debtor and its estate.

F. **Application for an Order Approving the Retention of Akin Gump Strauss Hauer & Feld LLP as Counsel for the Debtor in Possession.**

44. The Debtor is not a bankruptcy attorney, and accordingly requires professional assistance to navigate the chapter 11 process and professional advice regarding how to execute faithfully its duties as a debtor and debtor in possession and how to prosecute its chapter 11 case. The Debtor seeks to retain Akin Gump as its counsel to provide assistance and advice because, upon information and belief, Akin Gump has both broad bankruptcy experience and deep knowledge and familiarity with the Debtor's business affairs. This unique combination makes Akin Gump the most effective and efficient firm to represent the Debtor in this case. If the Debtor is required to retain attorneys other than Akin Gump in connection with the prosecution

of this chapter 11 case, the Debtor, its estate and all parties in interest will be prejudiced by the time and expense needed to educate such attorneys about the intricacies of the Debtor's business operations.

45. The Debtor respectfully submits that it is necessary and appropriate for it to employ and retain Akin Gump to provide, among other things, the following services:

    (a)    Render legal advice regarding the powers and duties of a debtor that continues to operate its business and manage its property as a debtor in possession;

    (b)    Take all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions on the Debtor's behalf, the defense of any actions commenced against the Debtor, the negotiation of disputes in which the Debtor is involved, and the preparation of objections to claims filed against the Debtor's estate;

    (c)    Prepare on behalf of the Debtor, as a debtor in possession, all necessary motions, applications, answers, orders, reports, and other papers in connection with the administration of the Debtor's estate and appear on Debtor's behalf at all hearings regarding the Debtor's case;

    (d)    Negotiate, prepare and file a plan of reorganization and related disclosure statement(s) and all related documents, and otherwise promote the financial rehabilitation of the Debtor; and

    (e)    Perform all other necessary legal services in connection with the prosecution of this chapter 11 case.

46. The Debtor seeks to employ Akin Gump under a general retainer and in accordance with Akin Gump's normal hourly rates and disbursement policies.

47. To the best of the Debtor's knowledge, and except as otherwise disclosed in the *Affidavit of Charles R. Gibbs in Support of Application for an Order Approving the Retention of Akin Gump Strauss Hauer & Feld LLP as Counsel to the Debtor in Possession* (the "Akin Gump Affidavit"), Akin Gump has not represented the Debtor, its creditors, or any other parties in interest, or their respective attorneys, in any matter relating to the Debtor or its estate.

48. To the best of the Debtor's knowledge, and except as otherwise disclosed in the Akin Gump Affidavit, Akin Gump does not hold or represent any interest adverse to the Debtor's estate, is a "disinterested person" as that phrase is defined in § 101(14), and such employment is necessary and in the best interests of the Debtor and its estate.

Dated: May 12, 2010

                               _____
                               Matilde G. Borchers

STATE OF TEXAS           §
                               §
COUNTY OF DALLAS     §

SUBSCRIBED TO AND SWORN TO BEFORE ME this 12th day of May, 2010.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                               _____
                               Notary Public in and for the State of Texas

[S E A L]

BRENDA R. PATRICK
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 3-26-2012